*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| DIEGO K. and CATHARINE K., ) | |
| ) | Supreme Court No. S-16374 |
| Appellants, ) | |
| ) | Superior Court No. 4SM-14-00002 CN |
| v. ) | |
| ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT ) | |
| OF HEALTH & SOCIAL SERVICES, ) | No. 7226 – February 23, 2018 |
| OFFICE OF CHILDREN'S SERVICES, ) | |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Dwayne W. McConnell, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Diego K. William T. Montgomery, Assistant Public Advocate, Bethel, and Richard K. Allen, Public Advocate, Anchorage, for Appellant Catharine K. Kathryn R. Vogel, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee. Justin Facey, Assistant Public Advocate, and Richard K. Allen, Public Advocate, Anchorage, on behalf of minor.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

CARNEY, Justice.

## I. INTRODUCTION

Parents appeal from a superior court's order that the Office of Children's Services (OCS) had satisfied the Indian Child Welfare Act's (ICWA) requirements authorizing the removal of their daughter, an Indian child, from their custody.[1] Because the court relied on information that was not in evidence to make the required ICWA removal findings,[2] we vacate the order authorizing removal.

## II. FACTS AND PROCEEDINGS

Diego K. and Catharine K. have a 16-year-old daughter, Mary,[3] who is an Indian child as defined by ICWA.[4] OCS took emergency custody of Mary and her older brother Claude in March 2014. It acted following a December 2013 report that Claude had been medivaced out of the family's village due to alcohol poisoning and that his parents had been too intoxicated to accompany him, and a March 2014 report that Diego and Catharine were intoxicated and fighting in their home. OCS alleged in its emergency

---

[1] Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963 (2012). ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

[2] Before a trial court may issue an order removing an Indian child from the child's parent the court must make two findings. 25 U.S.C. § 1912(d)-(e). First, OCS "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful"; this is known as an active efforts finding. 25 U.S.C. § 1912(d). Second, the court must make "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e).

[3] We use pseudonyms to protect the family's privacy.

[4] *See* 25 U.S.C. § 1903(4).

petition that the court should make child in need of aid (CINA) findings under a number of sections of AS 47.10.011:[5] (6) (physical harm), (8)(B) (mental injury), (9) (neglect), and (10) (substance abuse).[6] At the emergency custody hearing Diego and Catharine stipulated to probable cause that their children were in need of aid under AS 47.10.011, without admitting any of the facts alleged in the petition, and to temporary OCS custody pending an adjudication hearing. In August Diego and Catharine stipulated to adjudication of both children as children in need of aid under AS 47.10.011(9) (neglect), and to continued temporary OCS custody pending disposition.

The superior court held a disposition hearing over two days in December and January. OCS argued for an order authorizing it to remove the children from their parents' home;[7] the parents urged the court to grant OCS only the authority to supervise the family.[8]

---

[5] AS 47.10.011 sets forth 12 grounds on which a child may be determined to be in need of aid.

[6] The petition alleged that as a result of the parents' substance abuse, the children were in need of aid because they were being neglected and had suffered both physical harm and mental injury. It stated the children were neglected when the parents were too intoxicated to accompany Claude for medical treatment and that the children were at risk of physical harm and mental injury at that time, as well as when the intoxicated parents were fighting.

[7] *See* AS 47.10.080(c)(1) (authorizing court to find child to be in need of aid and order child placed in OCS's temporary custody).

[8] *See* AS 47.10.080(c)(2) (authorizing court to find child to be in need of aid and order OCS supervision over child while remaining in custody of its parent or guardian).

In support of its removal request, OCS called an expert as required by ICWA section 1912(e).[9] OCS offered Dr. Valerie Warren as an expert in clinical psychology with experience treating Native patients. The court qualified Dr. Warren over the parents' objections. She testified that the parents' continued custody of Claude and Mary placed the children at a serious risk of harm, and that, in her opinion, the children could not be safely returned to their parents as long as the parents continued to drink alcohol.

The OCS caseworker assigned to work with the family testified that the parents' drinking and domestic violence placed the children at risk, that there was a serious problem with mold on the walls throughout the family's home, and that she believed these threats still existed. In response to questioning about the efforts she had made to prevent the breakup of the family, the OCS caseworker testified that she had referred the parents to family counseling with Dr. Warren, helped the parents fill out paperwork for housing assistance to receive grants to repair their home, and referred them for substance abuse counseling and urinalysis testing in the village. She also testified to the services provided to the children, including assisting Mary with personal hygiene and enrolling her in recreational camps, as well as helping Claude join an AmeriCorps program and flying Catharine to his AmeriCorps graduation ceremony.[10]

---

[9]     "No foster care placement may be ordered . . . in the absence of a determination, supported by clear and convincing evidence, *including testimony of qualified expert witnesses*, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e) (emphasis added).

[10]     AmeriCorps is a national network of service programs that engage volunteers to provide services to local communities and non-profits. *AmeriCorps FAQs*, CORP. FOR NAT'L & COMMUNITY SERV., https://www.nationalservice.gov/programs/americorps/join-americorps/americorps-faqs (last visited Jan. 9, 2018).

She stated that OCS had provided calling cards so the children could call their parents and had arranged family visits in the village where the children were in foster care.

The court found that the children continued to be children in need of aid due to their parents' substance abuse.[11] Largely because of deficiencies in Dr. Warren's testimony, the court held that OCS had not proven by clear and convincing evidence that the children were likely to suffer harm if returned to their parents' care. The court found that OCS had not made active efforts to prevent the breakup of the family as required under 25 U.S.C. § 1912(d) because most of its efforts were "directed at enriching the lives of the children." The court therefore ordered Mary returned to her parents but placed her under OCS supervision.[12] The court ordered the parents not to consume alcohol, and it ordered OCS to arrange urinalysis testing to verify the parents' sobriety, to assist them in obtaining new integrated assessments for both alcohol abuse and mental health and in following the assessments' recommendations, and to assist the parents in removing mold from the family home.[13]

The court monitored the family's situation by holding regular status hearings. Between January 2015 and April 2016 the court held six hearings, five of which were scheduled as status hearings and one as a "potential removal hearing," although it was then treated as a status hearing. During each hearing OCS caseworkers

---

[11] AS 47.10.011(10) (substance abuse).

[12] *See* AS 47.10.080(c)(2). The court found that Claude was a child in need of aid but ordered him released from OCS custody because he would be 18 in 10 days and was "unlikely to benefit from any additional contact with [OCS]."

[13] At a later hearing in March 2015 the court expressed its continued concern that the extensive mold could make the home unlivable, noted that mold remediation can require special chemicals which might be difficult to obtain in the family's village, and ordered OCS to provide the family the needed chemicals.

provided updates about the efforts they had made to comply with the court's orders, the parents' activities since the last hearing, and Mary's condition.[14] Four of the hearings — on March 24, 2015; August 11, 2015; January 14, 2016; and February 18, 2016 — were informal meetings at which no evidence was admitted. Instead, OCS provided the court and parties with information relating to the status of counseling referrals, the parents' alcohol testing, Mary's school attendance and behavioral issues in school, and the social workers' visits to the family's home. At each hearing there were reports that Mary was regularly missing school. In addition, the parties discussed scheduling and other administrative matters.

At two of the status hearings OCS caseworkers testified under oath about the family's progress. In September 2015 OCS moved for removal findings authorizing it to take Mary into temporary OCS custody. OCS called the then-assigned caseworker and a village police officer as witnesses after they had visited the family and found both parents intoxicated at home. OCS asked the court to qualify the local village's ICWA worker, Daphne Joe, as an expert, but the parents objected that they had not received notice of the proposed expert or an expert report. The court did not qualify her as an expert. It also declined to make removal findings but noted it did not want Mary to remain in her parents' home until the hearing could be held at a later date, and it asked the parties to come to an agreement allowing her to stay with relatives in the village. The court then set a "potential removal hearing" for November.

---

[14] Over the course of the case three social workers were assigned to work with the family. The first was assigned following the emergency removal in March 2014 until sometime in the summer of 2015. The second appeared at the August 2015 status hearing and worked with the family through the status hearing in January 2016. The third appeared at the February 2016 status hearing and the removal hearing in April.

The "potential removal hearing" was held in November 2015 as scheduled. Although the parties had agreed Mary would live with relatives, it was reported that she was living in her parents' home. The hearing had been continued because OCS planned to call Daphne Joe as an expert, but it did not and relied instead on Dr. Warren's prior testimony. The parents called Joe to testify that she had recently visited the family home, and she had found Mary and Catharine in the home with no sign of alcohol on the premises. OCS then moved to qualify Joe as an expert, but the court declined to do so.[15] The OCS worker testified that Mary was still not attending school regularly. After the case worker's testimony OCS asked the court to authorize it to remove Mary from her parents' home. The court again declined to remove Mary but again ordered the parents not to drink and scheduled another status hearing.

At the next status hearing, in January 2016, no one was placed under oath. The same social worker and Mary provided updates to the court about Mary's attendance and performance at school. The court scheduled another status hearing for February.

At the February 2016 hearing OCS renewed its request that the court allow it to place Mary in a foster home. No evidence was presented, but the parties agreed that the court should schedule a removal hearing.

The court held a removal hearing in April 2016. OCS called a number of witnesses in support of its request to remove Mary from her parents' home. The principal of Mary's school testified that Mary had an absentee rate of 75% and was failing all of her classes. She testified that Mary's parents had never called the school about her absences. The social worker who had recently assumed responsibility for the case testified that he had done nothing to address the mold in the home or to obtain an alcohol assessment for Diego. He stated that he had attempted to talk to Mary about

---

[15]    The court noted that it would "take [her testimony] for what it's worth."

missing school but that she had refused to speak to him. The village's administrator testified that Diego and Catharine had not been attending the sobriety checks that OCS had arranged with village police officers. However he noted that the village police office was often empty as officers had to go into the village to assist with other matters.

OCS asked the court to find that removal was authorized based on the parents' substance abuse, domestic violence, and neglect. At the conclusion of the hearing, the court noted that the parents' behavior had not changed and that Mary's situation had deteriorated. It found by clear and convincing evidence that Mary was "being harmed by the lack of parental supervision, being harmed by the lack of what the parents should do to foster a growing, healthy child." The court ordered Mary removed from her parents' home. Catharine's attorney reminded the court that it was required to make a finding regarding active efforts. After first finding that the parents had not made active efforts, the court corrected itself and found that OCS had made the necessary active efforts to prevent the breakup of the Indian family. The court based its finding on statements by OCS social workers during the January and February 2016 status hearings. Catharine's attorney objected to the findings.

Two days after the removal hearing the parents filed a joint motion to stay the court's order. The parents argued that the court had inappropriately relied upon unsworn statements by OCS caseworkers to make its active efforts finding. The court denied their motion to stay and issued a supplemental order stating that it had also considered testimony from the status hearings in September and November 2015. The parents appeal.

We remanded this case to the superior court in June 2017 for additional findings regarding its removal order. Following remand the superior court issued an order clarifying that in making its removal findings it had "[taken] into account all previous hearings that occurred," including unsworn statements made by OCS

social workers during status hearings.

## III.   STANDARD OF REVIEW

"We review a superior court's findings of fact for clear error."[16] We review "de novo whether a superior court's findings satisfy the requirements of the CINA and ICWA statutes and rules."[17]

## IV.   DISCUSSION

The parents argue that the trial court failed to make the required ICWA findings necessary to remove their daughter from their home. Before removing an Indian child from the child's parents the court "shall inquire into and determine . . . whether active efforts have been made to provide remedial services and rehabilitative programs as required by 25 U.S.C. § 1912(d)."[18] The court cannot enter a disposition order if it finds that the requirements of 25 U.S.C. § 1912(d) have not been met.[19]

The trial court's order following remand affirmed that it took into account all prior hearings in reaching its decision to authorize Mary's removal, including status hearings at which only unsworn statements were presented. The parents argue that it was reversible error for the trial court to consider unsworn statements in making its determination because CINA Rule 3(h) states "testimony must be given under oath or

---

[16]   *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 269 (Alaska 2011) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 209 (Alaska 2010)).

[17]   *Id*. at 270 (quoting *Dale H.*, 235 P.3d at 210).

[18]   CINA Rule 10.1(b)(1). "Active efforts must be proven by clear and convincing evidence." *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1108 (Alaska 2011).

[19]   CINA Rule 10.1(b)(2).

affirmation as required by Evidence Rule 603."[20] Alaska Evidence Rule 603 requires that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so."[21] The parents argue that because the OCS workers did not take an oath before updating the court at various status hearings, their unsworn statements are not evidence, and cannot support the court's order authorizing removal.

Black's Law Dictionary defines "evidence" in relevant part as "[t]he collective mass of things, esp[ecially] testimony and exhibits, presented before a tribunal in a given dispute."[22] To become evidence, that is, part of the collective mass of things for a tribunal's consideration, the information must be proffered and admitted as required by the rules of the tribunal.[23] The Alaska Rules of Evidence establish the requirements for the "things" that can be considered by a superior court.[24] The OCS workers' unsworn

---

[20]    CINA Rule 3(h).

[21]    Alaska R. Evid. 603.

[22]    *Evidence*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[23]    *See* Alaska R. Evid. 103 (outlining considerations for rulings on evidence). Proffered evidence is "[e]vidence that is offered to the court to obtain a ruling on its admissibility." *Proffered evidence*, BLACK'S LAW DICTIONARY (10th ed. 2014). Admissible evidence is "[e]vidence that is relevant and is of such a character (e.g., not unfairly prejudicial, based on hearsay, or privileged) that the court should receive it." *Admissible Evidence*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[24]    Alaska R. Evid. 101.

statements were not presented to the trial court as required by the Alaska Rules of Evidence.[25]

Our evidence rules were promulgated to promote efficiency and fairness in the administration of justice, to ensure just proceedings, and to safeguard our judicial system and the rule of law on which it depends.[26] Preserving the rule of law requires that courts take actions based on the evidence before them, and to that end, the rules of evidence and procedure limit the form of information that may be introduced in court proceedings.[27] Some information, such as hearsay or unnecessarily prejudicial information, may therefore be excluded from the court's consideration to preserve the integrity of and promote public confidence in our judicial system.[28]

In cases involving issues of such fundamental importance as parents' rights to raise their children, it is imperative that the legal system act with great care to protect

---

[25] *See* Alaska R. Evid. 603.

[26] *See* Alaska R. Evid. 102 ("These rules shall be construed to secure fairness in administration . . . and promotion of growth and development of the law of evidence to the end that truth may be ascertained and proceedings justly determined.").

[27] *Cf. Patterson v. GEICO Gen. Ins. Co.*, 347 P.3d 562, 573-74 (Alaska 2015) ("The superior court had a duty to ensure that the trial was fair to [both parties]. The court took reasonable action to control the proceedings and prevent . . . introducing irrelevant facts and prejudicial arguments . . . . The court did not abuse its discretion by limiting . . . statements to the relevant evidence."); *Vachon v. Pugliese*, 931 P.2d 371, 381 (Alaska 1996) (affirming superior court which made sua sponte evidentiary rulings to exclude inadmissible evidence); *see also* Alaska R. Evid. 611(a) (requiring court control presentation of evidence).

[28] *See* Alaska R. Evid. 102, 403, 802. *But see* CINA Rule 10(b)(3) (permitting use of hearsay under certain circumstances in temporary custody hearing); 17(e) (permitting same in disposition hearing); 18(f) (permitting more limited use of hearsay under certain circumstances at trial to terminate parental rights).

parties' rights.[29] Adherence to our legal system's foundational principles and the safeguards put in place to ensure fair treatment of litigants must therefore be strict in such cases.

It is true, however, that CINA cases differ in many important ways from other civil cases. Because the focus in CINA cases is to prevent the breakup of the family,[30] many CINA cases proceed in ways that differ noticeably from the customary adversarial approach to litigation. CINA cases require ongoing effort and communication between parents, attorneys, social workers, guardians ad litem, various treatment and other professionals, and the court. In light of this reality, courts often schedule hearings to receive periodic updates on progress being made and its effect upon future court proceedings. These hearings are appropriate to provide such administrative and scheduling information in a relatively informal manner.

However, when the focus of such a hearing shifts to matters requiring the court to make specific factual findings and legal conclusions — such as whether probable cause exists to award temporary custody of a child to OCS, whether reasonable or active

---

[29] *See Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982) ("If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections . . . ."); *Debra P. v. Laurence S.*, 309 P.3d 1258, 1261 (Alaska 2013) (holding making final custody determination without sufficient notice violated mother's due process rights).

[30] Alaska's CINA statutes authorize state intervention in a family with the goal of "promot[ing] the child's welfare and the parents' participation in the upbringing of the child to the fullest extent consistent with the child's best interests." AS 47.10.005(1). Congress passed ICWA to address the "alarmingly high percentage of Indian families . . . broken up by the removal, often unwarranted, of their children" and "to promote the stability and security of Indian tribes and families." 25 U.S.C. §§ 1901-1902 (2012). ICWA therefore requires proof that active efforts were made to prevent the breakup of the family before an Indian child may be removed from her home. § 1912(d).

efforts were made, or any of the other specific findings required by state and federal law — then the court's decision must be based only upon evidence admitted pursuant to legal rules. The Alaska Rules of Evidence regulate the admissibility of evidence in Alaska courts. They govern all CINA proceedings, unless otherwise specified in the CINA Rules.[31] In this case the court relied on information it received at a number of hearings at which *no* evidence was admitted. This was error.

OCS argues that the parents failed to preserve this issue because they did not object at each hearing at which unsworn statements were made to the court and parties.[32] But the parents were not aware until after the court had already relied upon the unsworn statements that the court would make a decision without evidence to support it. The parents did not need to object to unsworn statements made during status hearings to preserve their right to later challenge the improper use of those statements in a removal decision.

Furthermore the parents did attempt to object. Both parents objected when OCS introduced expert testimony with insufficient notice during a status hearing. The court declined to address Diego's objection to the presentation of hearsay because the court stated it could rely on the statements "to decide . . . basically what kind of hearing to have." When Diego asked that OCS's witness be sworn for questioning during the same hearing the court stated, "I don't think we need to swear anyone in. This is just a status hearing." The court later specifically relied on statements from the hearing to make its active efforts finding. And both parents' attorneys objected to the court's reliance on those statements at the removal hearing.

---

[31]    CINA Rule 9(a).

[32]    The requirement that a party preserve an objection to challenge the effect of an erroneous ruling comes from the Alaska Rules of Evidence, which assumes the opposing party is offering evidence the party can object to. *See* Alaska R. Evid. 103.

OCS points out that some unsworn reports are required by court rules.[33] Those reports, however, differ from unsworn statements made in status hearings. The CINA Rules require that OCS provide the reports to the other parties in advance of the hearings to which the reports relate, providing the parties an opportunity to respond to or rebut the reports.[34] Such notice is essential to due process, which requires that the parents have adequate notice and opportunity to address the reports before the court.[35] In contrast, when OCS offered unsworn statements to support its request for removal findings, the court did not provide the parents with the notice and opportunity required by due process. Instead it told the parents that they could not object because the hearing was "just a status hearing."

No evidence was admitted at four status hearings in this case, those held in March 2015, August 2015, January 2016, and February 2016. Because these hearings provided no evidence to the court to support its decision authorizing Mary's removal from her parents' home, it was error to rely upon information from them to grant OCS's request to remove Mary.

Because the court committed legal error by relying upon substantial information not in evidence to support its removal findings, we vacate the court's removal order, and remand for the court to immediately schedule a new removal hearing.

---

[33] *See* CINA Rule 16(a)(1)-(3) (requiring OCS to submit predisposition report in advance of disposition hearing); CINA Rule 17.2(c) (requiring OCS to submit permanency report in advance of permanency hearing).

[34] CINA Rule 17.2(c); CINA Rule 19(b).

[35] *See* CINA Rule 17.2(c); CINA Rule 19(b); *Debra P. v. Laurence S.*, 309 P.3d 1258, 1261 (Alaska 2013) ("Procedural due process under the Alaska Constitution requires notice and opportunity for hearing appropriate to the nature of the case." (quoting *Lashbrook v. Lashbrook*, 957 P.2d 326, 328 (Alaska 1998))).

At the hearing, the court is to consider evidence regarding the family's current circumstances to determine whether removal from the parents' home is appropriate at this time.

## V.    CONCLUSION

We VACATE the trial court's removal order authorizing Mary's removal from her parents' home.  We REMAND this case to the superior court for further proceedings consistent with this order.