NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

## THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Quarantine or Isolation of | ) ) ) Supreme Court No. S-17933 |
| DANNY G. | ) ) Superior Court No. 4BE-20-00325 CI ) ) MEMORANDUM OPINION ) AND JUDGMENT* ) ) No. 1871 – January 19, 2022 |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, William T. Montgomery, Judge pro tem.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Danny G. Laura Fox, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Winfree, Chief Justice, Maassen, Carney, and Borghesan, Justices. [Henderson, Justice, not participating.]

1. Danny G.[1] tested positive for COVID-19 on October 12, 2020 in Bethel. The Department of Health and Social Services issued a statutorily authorized emergency

---

\*      Entered under Alaska Appellate Rule 214.

[1]      We use a pseudonym for privacy protection.

administrative isolation order on October 14;[2] because Danny was homeless, the Department ordered that he isolate at a local behavioral health residential facility. The Department's Chief Medical Officer, Dr. Anne Zink, then petitioned the superior court for an order directing Danny to remain isolated for about a week.[3] The filing included Dr. Zink's affidavit explaining the petition's factual basis, including that: COVID-19 is an acute respiratory syndrome caused by a virus; the World Health Organization declared the viral outbreak a pandemic; the virus spreads easily from person to person; infected individuals may infect multiple other people; the virus has an incubation period of up to 14 days and may spread from individuals who show no symptoms; the virus is a considerable health risk due to its ability to spread rapidly and widely and its ability to cause serious illness and death; and Danny had tested positive for the virus and had shown an inability or unwillingness to voluntarily isolate from others in the community.

---

[2]    *See* AS 18.15.385(e) (permitting Department to "issue an emergency administrative order to temporarily isolate or quarantine an individual" when it "has probable cause to believe that the delay involved in seeking a court order . . . would pose a clear and immediate threat to the public health"). Both "isolation" and "quarantine" involve "the physical separation and confinement of an individual" or group of individuals "to prevent or limit the transmission of the disease." AS 18.15.395(16), (21). A person to be "isolated" must be "infected or reasonably believed to be infected with a contagious or possibly contagious disease," and a person to be "quarantined" need only have been, or possibly have been, "exposed to a contagious or possibly contagious disease" without showing "signs or symptoms of a contagious disease." *Compare* AS 18.15.395(16), *with* AS 18.15.395(21). As discussed below, Danny had tested positive for COVID-19 but was asymptomatic. Depending on whether a positive COVID-19 test is a "sign or symptom," Danny could fall under either or both definitions; the distinction in his case is immaterial.

[3]    *See* AS 18.15.385(d)-(e) (requiring Department to file petition justifying necessity for quarantine or isolation "[w]ithin 24 hours after implementation of the emergency administrative order").

2.      Before a hearing set for October 16 could take place, Danny left the residential facility at least twice and was involuntarily hospitalized for a mental health evaluation.[4]  The isolation hearing was delayed until October 17.  Sometime before the hearing Danny was released from the hospital without being committed, and he then was arrested and jailed for violating the emergency administrative order requiring his isolation.  Danny participated in the isolation hearing telephonically from jail.

3.      At the hearing Danny's attorney indicated that "[t]he question for the court is where [Danny] will be ordered to isolate."  Danny initially agreed to isolate.  He was asked if he would stipulate to the isolation petition allegations that he had tested positive for COVID-19, was ordered to isolate at a residence, and had left the residence several times in violation of the order.  After speaking with his attorney, Danny stipulated to having COVID-19 and requiring isolation; no mention was made of his being contagious.  The court made clear that Danny was "giving up the right to contest" the evidence.  The parties proceeded as though the only remaining issue was where Danny should isolate.  The court and the parties released Dr. Zink, who likely would have testified about COVID-19 and its risk to the public, from the hearing.

While a local doctor was testifying about various locations for isolation, Danny interrupted to object that he did not have COVID-19.  The court responded that, given Danny's position that he did not have COVID-19, the court would be unable to accept Danny's previous stipulation.  The court then asked:  "Anyone want to put [forth] any evidence or present the exhibit that was attached to the petition, the test results for COVID-19?"  The State submitted Danny's positive COVID-19 test results from the regional hospital without objection.  The State asked the court if it needed "more

---

⁴      *See* AS 47.30.700 (permitting petition for ex parte order for mental health evaluation of individual who is "reasonably believed to present a likelihood of serious harm to self or others or is gravely disabled as a result of mental illness").

testimony to confirm anything that was in the petition or affidavit." The court said nothing more was needed at that time.

The local doctor continued with a detailed explanation of the COVID-19 test. She testified that the "highly sensitive and specific test" was rarely inaccurate and that the "results [were] even more reliable because of the pre-test possibility that the test was positive" due to local community outbreak. She said that although she understood Danny was asymptomatic, "40 to 60 percent of people who test positive for COVID-19 don't exhibit any symptoms or have such minor symptoms that they don't note them." She also described the importance of an asymptomatic person isolating for ten days: "[E]ven though the virus level may be below the level of detection if a test were done . . . , [Danny] could still infect other people."

Before hearing closing arguments, the court asked if any further evidence or stipulations needed to be admitted in addition to the "evidence about the COVID-19 test, the . . . testing procedures, [and] possible placements for [Danny] to stay." Both parties declined to offer anything further. Dr. Zink's affidavit containing information about COVID-19 transmission was not offered or accepted into evidence.

The State argued in closing that "[b]etween the petition, the [Zink] affidavit, . . . the [COVID] test result[,] and the very thorough explanation given by [the local doctor] about COVID-19 and the nature of the test results, [it] ha[d] established by clear and convincing evidence that" Danny had tested positive for COVID-19. Danny's counsel argued that the State had failed to meet its burden of clear and convincing evidence, asserting that when a person, like Danny, is asymptomatic and "doesn't believe they've been exposed to the virus," the hospital should provide a second test to satisfy the clear and convincing evidence standard. Danny's counsel declined to argue that COVID-19 does not meet the other isolation criteria, conceding: "Obviously, if [Danny] has COVID, I think isolation is the appropriate remedy."

The court found the facts were sufficient to warrant quarantine or isolation. Tracking language in Dr. Zink's affidavit, the court first found that "a medical officer from the State of Alaska ha[d] determined that [Danny was] exposed to COVID-19." Second, the court found that COVID-19 is a contagious disease based on Dr. Zink's affidavit and "judicial notice from the various orders issued by the court system," specifically "the Chief Justice . . . finding . . . that a pandemic has been issued with regard to COVID-19."[5]  Third, the court found that in light of Danny's earlier violations of his isolation order:  "Isolation or quarantine . . . is necessary [to] prevent or limit the transmission to others of a disease that poses significant risk to the public and no less restrictive alternative is available."  Fourth, the court found based on Dr. Zink's affidavit, the positive COVID-19 test, and the local doctor's testimony, that a "medical officer from the State of Alaska . . . determine[d] that quarantine, isolation or related procedures . . . are necessary."  The court ordered Danny to isolate for five days at the local behavioral health residential facility where he previously had been admitted, noting that jail would not be the least restrictive alternative available.

---

[5]    *Cf.* Special Order of the Chief Justice, Order No. 8155 (June 15, 2020) (describing high number of COVID-19 cases in Alaska and procedures for reducing transmission); Special Order of the Chief Justice, Order No. 8183 (Aug. 6, 2020) (extending suspension of jury trials until November 2 in light of continued spread of COVID-19); Special Order of the Chief Justice, Order No. 8131 (Amended) (Mar. 19, 2020) (referring to COVID-19 "pandemic").

At any stage of a proceeding, a trial court may take judicial notice of a fact if it is "not subject to reasonable dispute in that it is either (1) generally known within this state or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Alaska R. Evid. 201(b), 203(b).  And without request by a party, a trial court may take judicial notice of "duly adopted regulations and rules of court of every state" as well as "[d]uly enacted ordinances of . . . other governmental subdivisions."  Alaska R. Evid. 202(c)(1), (3).

4.      Danny now seeks to appeal his pre-hearing detainment in jail after having been arrested for violating the administrative isolation order.[6]   Danny's primary argument is that detainment in a correctional facility runs counter to the isolation or quarantine statute's goal of using the least restrictive means necessary to achieve its purposes.  Danny asks us to:  (1) "conclude that the state violated the purpose behind Alaska's isolation statute when it arrested Danny and held him in jail for his isolation" and (2) "hold that the trial court correctly concluded placement at the jail was not the least restrictive means of isolating Danny."

Neither request is properly before us.  This appeal is from the superior court's civil isolation order, not from an order evaluating the merits of Danny's arrest for violating the administrative isolation order or from a conviction for violating the administrative isolation order.  We generally decline to issue advisory opinions as a "rule of judicial self-restraint" grounded in the adversity requirement for standing.[7]  Although the parties disputed whether the court could order Danny to isolate at a correctional facility, the court found that jail would not be the least restrictive option and did not order Danny to isolate there.  Danny thus is not appealing from a decision by the court in this case but rather is asking us to issue an advisory opinion about separate pre-trial enforcement of the administrative isolation order.  We decline to address this issue further.

---

[6]      *See* AS 18.15.385(n), (o) (making knowingly or intentionally violating isolation or quarantine order a misdemeanor).

[7]      *Keller v. French*, 205 P.3d 299, 302 (Alaska 2009) (quoting *Ruckle v. Anchorage Sch. Dist.*, 85 P.3d 1030, 1034 (Alaska 2004)).

5.      Danny also appeals the superior court's isolation order.[8] The isolation and quarantine statute requires the court to find, "by clear and convincing evidence, that the isolation or quarantine is necessary to prevent or limit the transmission to others of a disease that poses a significant risk to the public health."[9] The person facing isolation or quarantine "has the right to . . . have the rules of evidence and civil procedure applied so as to provide for the informal but efficient presentation of evidence."[10] Even if a statutory scheme permits more informal proceedings, we require that "the court's decision . . . be based only upon evidence admitted pursuant to legal rules" when the hearing's focus "shifts to matters requiring the court to make specific factual findings and legal conclusions."[11] In the context of involuntary commitment proceedings, we

---

[8]      The State argues that Danny's appeal should be dismissed as moot because the isolation order has expired and "Danny has already received the only concrete relief a reversal could provide — that is, release from isolation." Danny argues that we should review the merits of his appeal under the public interest and collateral consequences exceptions to the mootness doctrine. *See, e.g.*, *In re Hospitalization of Naomi B.*, 435 P.3d 918, 925-29 (Alaska 2019) (discussing relevant factors for public interest and collateral consequences exceptions to mootness doctrine and applying public interest exception categorically to commitment appeals). Although we do not now categorically extend the public interest exception to the mootness doctrine to all appeals from quarantine or isolation orders, we agree with Danny that the specific facts of his case warrant reviewing the merits of his appeal under the public interest exception to the mootness doctrine.

[9]      AS 18.15.385(h).

[10]      AS 18.15.385(g)(3).

[11]      *Diego K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 411 P.3d 622, 629 (Alaska 2018) (requiring formal procedures if court must decide "any of the . . . specific findings required by state and federal law").

have expressly required that the commitment petition be admitted into evidence to be considered by the trial court.[12]

Danny concedes that the State presented evidence about his positive COVID-19 test and where he could isolate, but he denies that the State presented "evidence about what, if any, risks COVID-19 might pose to the public health." He argues that the State did not question the local doctor about COVID-19's risks to public health and did not admit into evidence Dr. Zink's affidavit describing those risks. He contends that it was error for the superior court to refer to and echo parts of Dr. Zink's affidavit in its isolation order and to take judicial notice of various contemporaneous orders issued by the court system regarding court operations during a declared pandemic. He characterizes the orders as information about the court's pandemic response rather than "an authority . . . on the science behind COVID-19." He contends that the orders were not subject to judicial notice under Alaska Evidence Rule 201 because "whether COVID-19 poses a significant risk to public health is subject to reasonable dispute."

The State disagrees with Danny's characterization of the local doctor's testimony, arguing that she "repeatedly affirmed that Danny's isolation was needed to protect the [local] community" and to prevent the spread of infection. The State further argues that it was not plain error for the court to consider Dr. Zink's affidavit because Danny had not disputed at trial that COVID-19 posed a public health risk[13] and "the

---

[12] *In re Hospitalization of Rabi R.*, 468 P.3d 721, 731-33 (Alaska 2020) ("Relying on allegations made only in petitions that were not admitted as evidence was error.").

[13] The State argues that Danny's counsel "*explicitly disclaimed*" the need for the State to present evidence of COVID-19's public health risk. (Emphasis in original.) Danny argues that his counsel could not "unilaterally relieve the state of its burden through stipulation" to demonstrate that COVID-19 is a significant public health risk —
(continued...)

transcript makes clear that if the State had moved to formally admit it into evidence, Danny's counsel would not have objected."[14] Finally the State argues that the court properly took "judicial notice of the 'various orders issued by the court system and . . . the Chief Justice there finding . . . that a pandemic has been issued with regard to COVID-19.' "

6. We agree with Danny that the superior court erred by relying on Dr. Zink's petition and affidavit. Even when a statutory scheme permits more informal proceedings, we require that "the court's decision . . . be based only upon evidence admitted pursuant to legal rules."[15] A petition for commitment, for example, "must be proffered and admitted as required by the rules of the tribunal" to become evidence.[16] Alaska Civil Rule 43.1(c) requires that exhibits be "marked for identification" and "admitted into evidence upon the motion of any party or upon the court's own motion." Only then may the information in an exhibit "become evidence, that is, part of the collective mass of things for a tribunal's consideration."[17] It was error for the superior court to refer to Dr. Zink's affidavit in its quarantine and isolation order.

7. We nonetheless disagree with Danny that insufficient evidence supported the required determination of a significant public health risk from Danny's transmission

---

[13]  (...continued)
only Danny himself could do that.

[14]  The State makes this extrapolation based on Danny's counsel's decision not "to argue that the disease doesn't meet the other criteria" under the statute and that when the State "referred to the affidavit as part of the evidence, [Danny] did not object."

[15]  *Diego K.*, 411 P.3d at 629 (requiring more formal procedures if court must decide "any of the . . . specific findings required by state and federal law").

[16]  *In re Rabi B.*, 468 P.3d at 731-32 (quoting *Diego K.*, 411 P.3d at 628).

[17]  *Id.* (quoting *Diego K.*, 468 P.3d at 628).

of the COVID-19 virus. First, evidence about Danny's positive COVID-19 test was admitted, and the local doctor testified about the validity of the test and the community's outbreak of the disease. The local doctor testified that, even though asymptomatic, Danny still could infect other people in the community, reflecting the contagious nature of the disease. And the disease's spread to rural Alaska and the specific local outbreak itself demonstrates that the disease is contagious. Second, we see no error in taking judicial notice of the fact that the disease is contagious[18] and potentially dangerous,[19] whether through the noted Chief Justice Orders or through the national and state public health declarations that underlie those Orders.[20] Given the disease's contagiousness, its community spread, and its potential for causing serious illness or fatality, the superior court did not err by finding a significant public health risk if Danny were not isolated.

8.      We AFFIRM the superior court's isolation order.

---

[18]      *See* Alaska R. Evid. 201(b) (requiring judicially noticed fact "be one not subject to reasonable dispute"). Danny argues that the superior court erred by taking judicial notice because "the level of risk COVID-19 might pose, and the appropriate level of government response, is a matter of great animated dispute in this state and nationwide." Danny thus reasons that a court could not take judicial notice "whether COVID-19 poses a significant risk to public health." But Danny misconstrues what the court found through judicial notice; it did not take notice that COVID-19 posed a significant public health risk, but rather that it "is a contagious disease." The fact that the disease is contagious and poses a danger of serious illness or fatality leads to the determination that public health is at risk, especially in light of Danny's inability to isolate voluntarily.

[19]      *See State v. Arctic Vill. Council*, 495 P.3d 313, 322-23, 323 n.26 (Alaska 2021) (Alaska 2021) (taking judicial notice of public records reporting numbers of COVID-19 cases, hospitalizations, and deaths).

[20]      *See id.* (taking judicial notice of basic facts about COVID-19 pandemic set out in national, state, and local health advisories and listing courts across country similarly taking judicial notice).