**NOTICE**

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

GERALD T., )
)   Supreme Court No. S-19127
             Appellant,    )
)   Superior Court No. 3DI-19-00014 CN
      v.    )
)   MEMORANDUM OPINION
STATE OF ALASKA, DEPARTMENT    )   AND JUDGMENT[*]
OF FAMILY & COMMUNITY    )
SERVICES, OFFICE OF CHILDREN'S   )   No. 2091 – May 21, 2025
SERVICES,    )
)
             Appellee.    )
)

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Dillingham, Christina Reigh, Judge.

Appearances: Chris Peloso, Juneau, for Appellant. Jennifer Teitell, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee. Paul F. McDermott, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian ad Litem. No appearance by Appellee Jessica M.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

---

[*]    Entered under Alaska Appellate Rule 214.

# I. INTRODUCTION

A father appeals the termination of his parental rights. He argues that the Office of Children's Services (OCS) failed to make active efforts to prevent the breakup of his family, as required by the Indian Child Welfare Act (ICWA).

We affirm the superior court. OCS's efforts were not perfect, but its efforts were hindered by the limited services available in prison and the father's unwillingness to cooperate with OCS. We see no error in the court's ruling that in light of these circumstances, and taking into account OCS's placement efforts and its reunification efforts toward the mother as well as the father, OCS's efforts were sufficiently active to comply with ICWA.

# II. FACTS AND PROCEEDINGS

## A. Facts

### 1. Background and removal

Gerald T. and Jessica M. are the parents of three children.[1] This case concerns the youngest, Adrian, who is a member of his parents' Tribe.

Adrian lived with his paternal grandmother until April 2019. At the time, it was believed that his grandmother had adopted Adrian and his siblings through a tribal adoption. So when Adrian's grandmother was found intoxicated with him, OCS proceeded as if she was Adrian's parent, filing an emergency petition for custody based on neglect and intoxication. Adrian's grandmother stipulated that the children were in need of aid, and OCS developed a case plan with her in September 2019. In the meantime, OCS placed the children with a relative in Anchorage. That placement was not successful, and the children were moved to the home of another relative.

In June 2020 OCS learned that the Tribe had not completed the paperwork necessary to finalize Adrian's tribal adoption, meaning that Gerald and Jessica were

---

[1] We use pseudonyms to protect the family's privacy. Jessica is not participating in this appeal.

still Adrian's legal parents. Then in July 2020 Gerald was arrested and charged with multiple crimes, including second-degree assault for beating and strangling Jessica.[2] The assault occurred in front of the three children, including Adrian's siblings. OCS filed an amended petition for adjudication in August 2020, naming Gerald and Jessica as Adrian's parents. The petition was based on Jessica's substance abuse, Gerald's assault of Jessica, and Gerald's incarceration. Around this time OCS transferred Adrian from his relative placement to a non-relative foster family.[3] Adrian has remained with this foster family for the duration of this case.

### 2.    Reunification efforts

Soon after Gerald's arrest, OCS caseworkers went to speak with him in jail. They reported that Gerald repeatedly yelled and screamed at them, saying they "weren't taking his children" and that they "were going to rape his children." According to the workers, they were unable to continue the conversation due to Gerald's conduct.

OCS created an initial case plan for Gerald in November 2020, without his input. The plan noted that Gerald refused to take responsibility for the children's removal, blaming Jessica instead, and that he demonstrated a lack of empathy for his children's trauma. OCS recommended that Gerald engage in services recommended by the Department of Corrections, obtain a substance abuse assessment and treatment, obtain a psychological evaluation, participate in a batterers' intervention program, and attend parenting classes.

---

[2]    Gerald had previously been convicted of assaulting Jessica in 2011, 2016, and 2017. In September 2019 Gerald was released on probation. He was briefly reincarcerated in February 2020 after he violated the conditions of his probation and was released again in April 2020. Gerald has spent substantial time in prison since Adrian's birth in 2017.

[3]    This foster family adopted Adrian's siblings in May 2023.

The following month, Gerald filed a motion to compel OCS to prepare a case plan for him and facilitate contact with Adrian.  The superior court granted the motion.  But a year later, in January 2022, Gerald informed the court at a hearing that he still did not have a case plan or effective communication with Adrian.  The court ordered OCS to file proof of compliance.  OCS failed to do so, so the court scheduled a hearing to show cause why it should not be held in contempt.  At the hearing, the court discovered that OCS had not met with Gerald since May 2021.  Stating that the lack of contact was unacceptable, the court ordered another compliance hearing to ensure that OCS scheduled visits and worked toward reunification with Gerald.

At an April 2022 compliance hearing, OCS's lawyer informed the court that the caseworker had attempted to meet with Gerald to discuss his case plan and update him on Adrian, but that Gerald became "hostile and confrontational" and that the caseworker "couldn't get him to talk about the case."[4]  Gerald stated in response that the caseworker had not identified herself, and that he told her that she was "interfering" with his effort to contact federal investigators about the kidnapping of his children.  The court indicated that OCS still needed to provide a family contact plan and documentation about any updates given to Gerald.  It added that if Gerald was not communicating with OCS, OCS should send any updates by mail.  OCS mailed Gerald an updated case plan in October 2022.

A caseworker eventually met Gerald in person in December 2022 and updated his case plan with him.  Following the meeting, she referred Gerald to a batterers' intervention program and substance abuse treatment at the prison; she was

---

**4** These statements were not made under oath, and we thus do not rely on them as evidence in evaluating active efforts. *See Diego K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 411 P.3d 622, 627-30 (Alaska 2018) (holding it was erroneous for superior court to rely on unsworn statements made by OCS workers at status hearings in granting removal request).  We describe these events only to provide context for Gerald's arguments on appeal.

later informed by prison officials that Gerald was ineligible to participate in these services because he had not yet been sentenced. Gerald was eventually sentenced in February 2024, receiving a sentence of ten years in prison with three suspended.

## B. Proceedings

In October 2023 OCS filed a petition to terminate Gerald's parental rights to Adrian. The superior court held a termination trial over two days in April and May 2024. It heard testimony from several witnesses, including two OCS caseworkers, Adrian's foster mother, and Gerald.

The court subsequently issued an order terminating Gerald's parental rights. It first found by clear and convincing evidence that Adrian was a child in need of aid as a result of abandonment, Gerald's incarceration, domestic violence, neglect, and substance abuse.[5] It concluded that Gerald had not remedied the conduct that placed Adrian at substantial risk of harm.

The court then found by clear and convincing evidence that OCS made active efforts to prevent the breakup of the family. It credited OCS for making case plans while finding that "[c]ase planning consistently was a challenge because [Gerald] refused to engage with caseworkers and consistently blamed others, mostly [Jessica], for his conduct." It also found that when OCS contacted Gerald, "he consistently refused or became irate with OCS." The court noted that despite these difficulties, OCS facilitated "weekly, sometimes biweekly Zoom visits." These visits continued even after Gerald "verbally attacked" Adrian. But after Gerald failed to show up for two or three calls, OCS put visitation on pause and sought a therapeutic recommendation on how to facilitate contact between Gerald and Adrian. In the meantime, OCS encouraged Gerald to write Adrian letters in lieu of the visits.

---

[5]  *See* AS 46.10.011(1), (2), (6), (8), (9), (10).

Emphasizing that the case was "about family reunification, not simply reunification with one parent," the court credited OCS's work with Gerald's grandmother and Jessica to offer services designed to allow Adrian to return to their care. The court also noted OCS's efforts to place Adrian with extended family members. Considering OCS's efforts with respect to both parents and the grandmother, the court concluded that OCS had made active efforts to reunite the family.

The court next found by a preponderance of the evidence that termination was in Adrian's best interest. It also found proof beyond a reasonable doubt that Gerald's continued custody of Adrian would likely result in serious emotional or physical damage. Therefore, the court granted OCS's petition to terminate Gerald's parental rights.

Gerald appeals.

## III. STANDARD OF REVIEW

"The question of whether the State has complied with the Indian Child Welfare Act's (ICWA's) 'active efforts' requirement is a mixed question of law and fact."[6] "We review the factual findings underlying an active efforts determination for clear error, reversing only if a review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[7] "Whether those factual findings satisfy the requirements of ICWA is a question of law to which we apply our

---

[6] *T.F. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 26 P.3d 1089, 1092 (Alaska 2001).

[7] *Anton K. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s. Servs.*, 554 P.3d 456, 465 (Alaska 2024) (quoting *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021)).

independent judgment, 'adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy.' "[8]

## IV. DISCUSSION

The sole question before us is whether OCS made active efforts to prevent the breakup of the family. Under ICWA, before parental rights may be terminated, OCS must show by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[9] There is "no pat formula" for distinguishing between active and passive efforts.[10] But we have described active efforts as "taking a parent through the steps of a plan and helping the parent develop the resources to succeed," whereas passive efforts are merely "drawing up a case plan and leaving the client to satisfy it."[11]

We begin by explaining that active efforts toward both parents may be considered in determining whether OCS met the requirement. We then address the superior court's finding that Gerald's behavior hindered OCS's efforts. We finally explain why we agree with the superior court's determination that OCS's efforts amounted to active efforts under ICWA.

---

**8**   *Id.* (quoting *Native Vill. Of Kwinhagak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 542 P.3d 1099, 1109 (Alaska 2024)) (alteration in original).

**9**   25 U.S.C. § 1912(d); *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 763 (Alaska 2009); *see also* CINA Rule 18(c)(2) (indicating burden of proof).

**10**   *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)).

**11**   *Jon S.*, 212 P.3d at 763.

**A.** **The Superior Court Did Not Err By Considering Efforts Made Toward Jessica And Adrian's Grandmother.**

Gerald argues that the superior court improperly considered efforts OCS made with Jessica and Adrian's grandmother in determining whether it made active efforts in this case. He points to AS 47.10.086, which addresses OCS's duty to make reasonable efforts in child welfare cases generally rather than its duty to make active efforts in cases governed by ICWA.[12] Gerald contends that the statute's use of the word "parent" in the singular form means that the court must consider efforts "individually for each parent, not in a single amorphous blob."[13] Gerald suggests that following the superior court's reasoning, OCS could choose to work with only one parent, ignore the other, and still meet ICWA's active efforts requirement. We disagree with both Gerald's legal argument and his characterization of the superior court's order.

First, a court may consider OCS's reunification efforts with both parents when determining whether active efforts have been made toward the family as a whole.[14] ICWA requires efforts "designed to prevent the breakup of the Indian family."[15] When one parent is incarcerated, directing efforts toward the out-of-custody

---

[12]    AS 47.10.086(a).

[13]    *See id.*

[14]    *Anton K. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 554 P.3d 456, 470-71 (Alaska 2024).

[15]    25 U.S.C. § 1912(d). Gerald's reliance on the text of AS 47.10.086(a) is misplaced because this statute does not define active efforts under ICWA; it describes OCS's duty to make reasonable efforts in cases not governed by ICWA. *See* AS 47.10.086(a). In any event, we read the statute's description of reasonable efforts to mean that a court may consider OCS's efforts toward one parent when assessing whether OCS has made reasonable efforts as part of termination proceedings against the other parent. The statute provides that efforts shall be provided to the entire family — "to the child and to the parents or guardian of the child" — so as "to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate." *Id.*

parent is especially critical because reunification with the incarcerated parent "may not be possible within a reasonable timeframe."[16] "[E]fforts to reunify the children with a nonincarcerated parent are 'an important aspect of [OCS's] active efforts to keep the family together.' "[17] Efforts to place children with another relative who supports the goal of reunification may also "be credited by the court toward active efforts."[18]

Second, the superior court did not suggest that efforts made with Jessica or Adrian's grandmother excused OCS from making efforts toward Gerald. The court stated that it needed to look at "the totality of the circumstances," adding, "in this case, that includes what OCS did with [the grandmother] early on, with [Jessica], and with [Gerald] as well." It reasoned that this broad approach was proper because "[t]his [case] is about family reunification, not simply reunification with one parent." The superior court did not err by considering efforts OCS made toward Jessica and Adrian's grandmother in conjunction with efforts toward Gerald.

### B. The Superior Court Did Not Err In Considering Gerald's Unwillingness To Cooperate With OCS When Evaluating OCS's Efforts.

Gerald contends that the superior court improperly placed the blame for OCS's infrequent contacts with him because of his unwillingness to work with his caseworkers. He asserts that OCS had a responsibility to attempt to overcome his noncooperation. Gerald reasons that because OCS made no attempt to do so, OCS failed to make active efforts.

---

[16] *Anton K.*, 554 P.3d at 467.

[17] *Id.* at 467 & n.34 (quoting *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 850 (Alaska 2009)) (alteration in original).

[18] *Id.*

Gerald is correct that his unwillingness to participate cannot be used to excuse OCS from making active efforts.[19] "[W]hen a parent is unwilling to cooperate or to participate, OCS's response must be to attempt to overcome that noncooperation."[20]

But a parent's actions "have a place in the court's determination of whether OCS's efforts satisfy the ICWA standard."[21] A parent's unwillingness to cooperate may "influence what actions qualify as active efforts."[22]

We see no clear error in the superior court's factual finding that Gerald's "unwillingness to talk to OCS" made case planning with him "challenging." At trial, an OCS caseworker testified that her first conversation with Gerald "escalated pretty quickly" and that Gerald "just kept repeating that [OCS wasn't] taking his children [and] that [OCS was] going to rape his children." Gerald also testified that he had refused to speak to OCS caseworkers because he did not like their attitude and that he had rejected calls from unknown callers.

Nor did the superior court commit legal error when it considered Gerald's noncooperation in its assessment of OCS's efforts. The court did not "excuse" a lack of efforts by OCS. Rather, it described OCS's continuing (although initially deficient) efforts to overcome Gerald's resistance and to engage him, explaining that OCS was "trying to make efforts" even as Gerald refused to cooperate. Despite difficulties

---

[19]     *See Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 562 (Alaska 2022) ("A parent's lack of cooperation or unwillingness to participate in treatment does not excuse OCS from making active efforts and proving that it has made them; we cannot create a judicial exception to ICWA.") (footnote omitted); *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 (Alaska 2019) ("[T]he parents' lack of effort does not excuse OCS's failure to make and demonstrate its efforts.").

[20]     *Mona J.*, 511 P.3d at 563.

[21]     *Id.* at 562.

[22]     *Id.* at 562-63 (citations omitted).

communicating with Gerald, OCS developed a case plan in November 2020. Several subsequent case plans were also made without his help. An OCS caseworker was eventually able to visit Gerald in December 2022 to develop a collaborative case plan.

As discussed below, the record also indicates that later in the case, OCS did engage in other efforts to facilitate visitation and identify services at the prison. For instance, OCS encouraged Gerald to write Adrian letters after Gerald's behavior resulted in video contact being paused. It also forwarded Gerald updates about Adrian from Adrian's foster family. These efforts were not perfect, but they reflected attempts to overcome Gerald's noncooperation. We see no error in the superior court's treatment of this issue.

## C. The Superior Court Did Not Err By Concluding There Was Clear And Convincing Evidence That OCS Made Active Efforts To Prevent The Breakup Of The Indian Family.

Gerald also challenges the totality of OCS's efforts, suggesting that OCS made no efforts toward him beyond facilitating visitation. He contends that OCS included "only boilerplate activities" in his case plan and failed to check whether those activities were actually available. We are not persuaded by these points.

The "circumstances surrounding a parent's incarceration may have a direct bearing on what active remedial efforts are possible."[23] Such circumstances include "the duration of the parent's incarceration and the services possible for incarcerated parents."[24] For instance, in *Anton K.*, we explained that the father's then-pending criminal charges made it "impossible or impractical for OCS to provide some of the services listed in his case plan."[25] Available services were also limited because

---

[23] *Anton K.*, 554 P.3d at 466 (quoting *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995)).

[24] *Id.* (quoting *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 849 (Alaska 2009)).

[25] *Id.* at 470.

the father engaged in misconduct and declined multiple calls from OCS caseworkers.[26] In that case OCS's efforts were "passive in some respects"[27]: notably, OCS failed to facilitate any form of visitation between the father and his children for more than three years without formally notifying him that it had decided to deny visitation.[28]  Despite this, we concluded that OCS had made active efforts, citing the reunification efforts the department made before the father was incarcerated and its later efforts to place the child with extended family members.[29]

OCS's efforts in this case go beyond those made in *Anton K.*  Here, OCS facilitated visitation at the start of the case, arranging video calls between Gerald and Adrian.  These calls continued even after Gerald "verbally attacked" Adrian on a call.  It was only after Gerald failed to show up for the calls two or three times that the calls were paused for an evaluation to see whether having contact with Gerald was in Adrian's best interest.  Though there was a delay in getting this evaluation, OCS encouraged Gerald to write letters to Adrian in the meantime.  Gerald wrote around four letters to Adrian before stopping.  An OCS caseworker testified that she also emailed Gerald periodic updates about Adrian from December 2022 until trial.

In contrast to *Anton K.*, OCS did reach out to the prison to check whether certain programs were available to Gerald.[30]  An OCS caseworker testified that she referred Gerald to a batterers' intervention program and substance abuse treatment in December 2022.  But upon reaching out to officials at Gerald's prison, she learned Gerald was ineligible to participate in most programs until he was sentenced.  Gerald was not sentenced until February 2024.  Thus, he was limited to taking shorter

---

[26]     *Id.*

[27]     *Id.* at 469.

[28]     *Id.* at 468.

[29]     *Id.* at 471-72.

[30]     *See id.* at 469.

educational classes. OCS also requested a mental health assessment for Gerald, but this was denied by the prison.

Beyond its efforts with Gerald, OCS also made efforts to reunify Adrian with Jessica. OCS engaged Jessica in case planning in June 2020 and subsequently referred her for treatment to address her substance abuse and mental health issues. OCS and Jessica also discussed parenting education and skills training, financial resources, and housing assistance. Jessica ultimately decided that she preferred for Adrian to be adopted by his foster parents.

At the same time, OCS worked to place Adrian and his siblings with extended family. A caseworker testified that OCS had conducted an "extensive relative search" and "worked with the Tribe to identify any members of the community that would have been able to take the children." The caseworker added that OCS "spent a long time exploring any available options, [like] ICWA-compliant homes that could take and provide permanency to the three children." Only after Adrian was placed with two relatives and these placements failed did OCS place him with a non-relative foster family. This foster family has adopted Adrian's siblings. And Adrian's foster mother testified that she supported the children's continuing relationship with Jessica and that she also supported contact with Gerald, provided that Gerald remained respectful.

In light of Gerald's lengthy period of incarceration, and viewing OCS's efforts as a whole, we conclude that there is clear and convincing evidence that OCS made active efforts to reunify the family.

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Gerald's parental rights.