*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ANTON K., | ) | |
| | ) | Supreme Court No. S-18916 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3PA-19- |
| v. | ) | 00182 CN/00183 CN (Consolidated) |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | O P I N I O N |
| OF FAMILY & COMMUNITY | ) | |
| SERVICES, OFFICE OF CHILDREN'S | ) | No. 7712 – August 30, 2024 |
| SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kristen C. Stohler, Judge.

Appearances: Katrina Larsen, Ketchikan, for Appellant. Jennifer Teitell, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.

## I.      INTRODUCTION

The incarcerated father of two Indian children appeals an order terminating his parental rights. He argues that the Office of Children's Services (OCS)

failed to make active efforts to prevent the breakup of his family while he was incarcerated.

Before the father's lengthy period of incarceration, OCS sought to reunite the children with both the father and the mother. During the father's incarceration, there were significant gaps in OCS's efforts to facilitate visitation between him and his children, but he was provided with some rehabilitative services. OCS also continued to make timely, affirmative efforts to reunify the children with their mother. Later, it worked with the children's Tribe to place the children with paternal relatives who could have facilitated visitation with the father. When those efforts proved unsuccessful, OCS eventually succeeded in placing the children with maternal relatives.

The father has been incarcerated for a substantial period of time and could continue to be incarcerated for decades. The father's incarceration and other circumstances in this case impeded OCS's efforts. But those efforts, considered in their entirety, were active. We therefore affirm the court's order terminating the father's parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Background And Removal

Anton K. and Keri K. have two daughters: Allie, born in 2017, and Melissa, born in 2018.[1] Allie and Melissa are eligible for enrollment in Anton's Tribe and thus are Indian children as defined in the Indian Child Welfare Act (ICWA).[2] Anton is not the father of Keri's other child, Iris G., who also lived with Anton and Keri in the

---

[1] We use pseudonyms to protect the family's privacy. Keri is not participating in this appeal.

[2] *See* 25 U.S.C. § 1903(4) (defining "Indian child" to include any person under 18 years of age who is unmarried, "eligible for membership in an Indian tribe," and "the biological child of a member of an Indian tribe").

family home.[3]  Anton has a criminal history that includes a conviction in 2013 for incest after he impregnated his 13-year-old niece.

OCS removed Allie and Melissa from Anton and Keri's home in October 2019 in response to reports that Anton and Keri were abusing alcohol, neglecting the children, physically abusing them, and exposing them to domestic violence and sexual abuse.

OCS petitioned the court for temporary custody, alleging that then-six-year-old Iris had "reported two instances of [Anton] touching her genitals."  The petition alleged that Iris also reported witnessing domestic violence between Anton and Keri.  It stated that OCS had received two prior reports regarding Anton, each involving Anton acting aggressively while intoxicated.

After taking custody, OCS placed Allie and Melissa in a foster home in Anchorage.  The superior court later entered provisional findings that there was probable cause to believe that Allie and Melissa were children in need of aid, that they faced an imminent risk of harm if they remained in Anton and Keri's home, and that OCS had made active efforts to avoid removing the children.[4]

## B.    Events Following Removal

### 1.    Initial reunification efforts and Anton's arrest and incarceration

After taking custody of Allie and Melissa, OCS met with Anton and Keri in November 2019, developed case plans for them, and organized at least one in-person visit with Allie and Melissa at an OCS office.  OCS also gave Anton taxi vouchers to help him travel to and from visits and other appointments and began working with the

---

[3]     Parental rights regarding Iris are not at issue in this appeal.

[4]     *See* AS 47.10.142(e); CINA Rules 10(c)(2)-(3), 10.1(b)(1).

children's Tribe.[5]  The Tribe filed its notice of intervention in this case in November 2019.

Anton's case plan, which he signed in January 2020, required him to complete a domestic violence intervention program and parenting education classes.  It also required him to complete a substance abuse assessment, follow all resulting treatment recommendations, "engage in a sober support group," and complete random urinalysis and hair follicle testing.  Finally, it called for him to complete "an extensive psychological assessment or re-evaluation by a specialist with a background in child sexual abuse offenders" and follow all resulting recommendations.  The plan included names and phone numbers for service providers who could help him with most of the recommended activities.

OCS also developed a case plan with Keri, which included names and phone numbers for service providers who could help her with her case plan goals and stated that OCS would send referrals to two of those providers.

A little more than a week after Anton signed his case plan, he was charged with multiple acts of physical and sexual assault against Keri.  He was arrested and incarcerated.  Anton was later indicted on three counts of first-degree sexual assault, four counts of second-degree sexual assault, and nine counts of third-degree assault.  While this case was pending before us, a jury convicted Anton on all 16 counts against him.  Given his prior criminal history, Anton faces a sentence of multiple decades in prison for these offenses.[6]

---

[5]     Because Allie and Melissa are eligible for enrollment in Anton's Tribe, we refer to that Tribe as "the children's Tribe" in this opinion.  *See* 25 U.S.C. § 1903(5) (" 'Indian child's tribe' means (a) the Indian tribe in which an Indian child is a member or eligible for membership . . . .").

[6]     *See* AS 12.55.125(i)(1)(D), (i)(3)(C).

Anton remained incarcerated pending his criminal trial from January 2020 through the completion of the termination trial in August 2023.[7] He was incarcerated at Goose Creek Correctional Center in Wasilla until July 2021, when the Department of Corrections (DOC) transferred him to Wildwood Correctional Complex in Kenai.

### 2. Efforts during Anton's incarceration

After Anton's arrest, OCS continued to make efforts to reunify the family. Some of those efforts were directed toward reunifying the children with Anton, some were directed toward reunification with Keri, and other efforts were made to place the children with Anton's and Keri's relatives. OCS remained in regular contact with the children's Tribe about these efforts.

### a. Efforts toward Anton

Restrictions related to the COVID-19 pandemic severely limited the rehabilitative services available to Anton while he was incarcerated. There is no evidence that Anton received service during the first 15 months of his incarceration.

In March 2021, with encouragement from either DOC or OCS, Anton completed a behavioral health intake assessment, including a substance abuse assessment, with a telehealth interviewer. The interviewer's report noted that Anton "appear[ed] to have moderate levels of alcohol related problems" and that "[o]btaining alcohol treatment is of profound importance to [Anton]." The report recommended that Anton receive intensive outpatient treatment for alcohol addiction.

OCS completed an evaluation of Anton's progress on his case plan in June 2021. The evaluation noted that the services identified in Anton's case plan were not available due to his incarceration and restrictions related to COVID-19. But OCS did not update Anton's case plan to reflect his incarcerated status or the lack of available services. The evaluation noted that OCS was pursuing termination of Anton's parental rights.

---

[7] Anton remains incarcerated.

In July 2021, DOC transferred Anton to Wildwood Correctional Complex in Kenai. While at Wildwood, Anton received a disciplinary writeup and sanction that reclassified him to a more restrictive custody level.

Services at Wildwood, like those at Goose Creek, were initially limited due to the COVID-19 pandemic. But by the time of the termination trial, Anton had participated in classes on "mindfulness, building coping skills, distress tolerance, [and] emotional regulation" while at Wildwood. He also participated in a six-week anger management class. However, Wildwood did not offer a domestic violence intervention program. And although Wildwood did offer peer sobriety support groups and some mental health services, the record does not indicate that Anton used those services.

Anton had multiple phone conversations with OCS caseworkers after his arrest. A caseworker reported that, while Anton accepted some of her calls and had conversations with her, Anton had declined phone calls from her "three or four" times. Anton also declined another call from a different caseworker.

In July 2022, Anton asked the assigned caseworker to set up phone services so that he could make outgoing calls to her and to Allie and Melissa's foster parent,[8] but both the caseworker and the foster parent refused. The caseworker explained that she believed setting up these accounts would have required sharing personal identifying information with Anton, which neither the caseworker nor the foster parent was willing to do.

In December 2022 a Wildwood employee emailed an OCS employee at Anton's request to ask for assistance arranging an in-person meeting with OCS at Wildwood. OCS proposed a phone call with his caseworker instead. A few days later

---

[8]    People in DOC custody generally cannot place outgoing phone calls unless the recipient of the call has established an account with DOC's phone services vendor. *See generally Inmate Phone System*, ALASKA DEP'T OF CORR., https://doc.alaska.gov/inmate-phone-system (last visited July 2, 2024).

OCS completed another evaluation of Anton's progress on his case plan. The evaluation stated that Anton had "not maintained contact with [OCS] through scheduled telephonic caseworker visits." It did not mention the recent email, the calls Anton had accepted from OCS, or Anton's request to set up phone services to enable him to communicate with his caseworker and the children's foster placement.

Anton did not have any phone calls or in-person visits with his children between his arrest in January 2020 and the conclusion of the termination trial in August 2023. There appear to have been several reasons for this outcome. First, OCS and the children's guardian ad litem had concerns that visiting with Anton in person in jail was not in the children's best interests. Second, practical complications related to Anton's incarceration and the COVID-19 pandemic made it difficult to arrange in-person visits or calls with Anton. Third, the children's foster parent refused to bring the children to visit Anton or to set up calls with him because engaging with him "triggered" the foster parent's post-traumatic stress disorder. Fourth, Wildwood mistakenly told OCS that Anton was not allowed to have visits or calls with children.

After a new OCS caseworker assumed responsibility for the case in September 2021, she attempted to set up visitation with Anton. The caseworker later explained that Anton's transfer to Wildwood had made it difficult to arrange visits with his daughters because of its remote location — up to a six-hour round-trip drive from the children's foster placement in Anchorage — and Anton's custody classification.

OCS considered setting up telephonic visits in which the children would call in from the OCS office in Anchorage. In November 2022 OCS developed a family contact plan for these visits, including identifying topics Anton could not discuss and establishing a protocol for addressing any problems that arose. The plan stated the visits would take place once per week and that the Anchorage OCS office would provide transportation between the children's foster placement and the OCS office. However, an OCS caseworker later stated that "the Anchorage office declined to facilitate any visits," explaining that it did so "due to the lack of staffing" and Wildwood's inability

to guarantee that Anton would be available to call OCS for the visit at a particular date and time.

Anton requested the address of the foster home where Allie and Melissa were living so that he could send letters to the children. His caseworker offered that Anton could instead send letters to her and she would pass them along to his daughters, but she reported that Anton replied, "[D]on't bother; nothing's going to happen anyway." However, Anton eventually did send the children birthday cards and Christmas cards. In December 2022 OCS started sending Anton photos of his daughters.

Finally, in late January 2023 an OCS supervisor emailed Anton's institutional probation officer to ask if Anton could have in-person or video visits with his daughters. In this email, the supervisor mistakenly stated that Anton had pending charges for offenses against children and cited a guideline stating that "inmates who have committed a crime against a child may be ineligible for visits from a minor." The probation officer replied that an "[i]n-person visit is not an option for [Anton]."[9] However, the probation officer also stated that DOC could accommodate a visit via video conference. OCS did not follow up to arrange a video visit.

### b.    Efforts toward Keri

After Anton was incarcerated in January 2020, OCS continued to make efforts to reunite the children with Keri. Keri made some progress on her case plan: She completed parenting classes, attended a domestic violence support group, and received mental health treatment. Keri stipulated in June that active efforts were being made to prevent the breakup of the family.

---

[9]    This statement appears to have been inaccurate, potentially because of OCS's mistaken description of Anton's then-pending charges. Anton's institutional probation officer later testified at the termination trial that Anton "[did] not have any restrictions when it comes to visitation."

OCS placed Allie and Melissa with Keri for a trial home visit in July. In connection with that visit, a caseworker helped Keri install a baby gate. OCS also assisted in efforts to secure childcare so that Keri could continue to attend classes recommended in her case plan during the trial home visit. It also gave Keri housing applications and referrals for housing assistance.

At the time of the trial home visit Keri was pregnant with her third child with Anton. That baby was born in August 2020, and was transferred to a neonatal intensive care unit soon after his birth. The hospital later sent the baby home with Keri after teaching her how to tend to his medical needs, including how to use his oxygen monitor. The baby became hypoxic that night after Keri turned off the alarm on the oxygen monitor, and he later died. Keri later admitted that she had been drinking that night. After this incident, OCS removed Allie and Melissa from Keri's care.

OCS continued to meet with Keri and arrange visitation until May 2021, when it filed a petition to terminate her and Anton's parental rights. Keri relinquished her parental rights in April 2023.

### c. Efforts to place the children with either Anton's or Keri's relatives

Anton requested several times that OCS place Allie and Melissa with members of his family. Anton suggested that placing the children with these relatives would have allowed him more opportunities for visitation with them and helped him remain involved in their lives. Three of Anton's relatives requested placement: his brother, mother, and cousin. OCS conferred with the children's Tribe about the possibility of placing Allie and Melissa with Anton's brother and mother and investigated all three relatives as potential placements, but it ultimately declined Anton's requests for placement with any of the family members he identified.

OCS initially denied placement with Anton's brother, Jeremy, because it mistakenly concluded that he was a sex offender, in part because a different person with a similar name and birthdate had been convicted of sex crimes. OCS also had concerns

that Jeremy would not adequately protect the children from Anton. In August 2022 Jeremy withdrew his request for placement because he intended to serve as a third-party custodian for Anton if he were released from jail in his criminal case. Jeremy later passed an OCS background check. Although Jeremy did not ultimately become Anton's third-party custodian, Jeremy did not renew his placement request. A representative of the children's Tribe attempted to follow up, but Jeremy did not respond. Jeremy subsequently requested a placement review hearing, but he failed to attend the hearing.

OCS declined to place Allie and Melissa with Anton's mother, Lydia, because it concluded she did not believe he was a sex offender, would not be adequately protective of the children, and did not have the financial means to care for them.[10] OCS records also indicated there was a substantiated report that Lydia had committed a sex offense when Anton was a child. Lydia requested a placement review hearing, but she did not call in for the hearing, and the court considered her request withdrawn.

Finally, OCS denied placement with Anton's cousin because she or someone else in her household had been convicted of a crime that was a barrier to foster placement that would have required a variance; the cousin did not request a variance.[11]

After efforts to place Allie and Melissa with Anton's relatives failed, OCS continued to work with the children's Tribe to identify and assess placement options. It eventually placed the children with their maternal uncles, Arnold and Mark Peterson. The Petersons live in Canada. They visited their nieces in person in August and

---

[10]     We caution that AS 47.14.100(m) provides that "poverty" is not "[p]rima facie evidence of good cause not to place a child with an adult family member." However, any error OCS may have made by relying on evidence of Lydia's limited financial means does not affect our analysis in this case.

[11]     *See* 7 Alaska Administrative Code (AAC) 10.905 (defining barrier crimes and conditions); 7 AAC 10.930 (providing for variances for individuals with barriers to placement under certain conditions, upon request by individual seeking placement).

November 2022. In February 2023 the Petersons were in Alaska to visit the children again and to attend court proceedings in this case. During the Petersons' stay in Alaska, OCS removed Allie and Melissa from their foster placement on an emergency basis. OCS then placed Allie and Melissa with the Petersons and put the Petersons in contact with the children's Tribe. Arnold extended his stay in Alaska to care for the children until May, when OCS gave its approval for him to take the children to Canada.

## C. Termination Trial

The superior court held a termination trial over four days between May and August 2023. Witnesses included one of the three OCS caseworkers who worked with the family after removal; an OCS supervisor; Anton's brother, Jeremy; and the children's maternal uncle, Arnold.

An expert in child welfare also testified to her conclusion that Allie and Melissa would likely suffer serious emotional or physical harm if returned to Anton's custody. Another witness testified as an expert in the cultures of the 56 villages of the Yukon-Kuskokwim Delta, including Anton's village. She testified that OCS's actions in this case, including seeking termination of Anton's parental rights, were culturally appropriate.

Finally, OCS called Anton as a witness. He invoked his Fifth Amendment privilege against self-incrimination when asked about the events underlying his then-pending charges and whether he presented "a risk of sexual abuse or violence to [his] daughters." When asked how he would be a parent to Allie and Melissa while incarcerated, Anton testified that he "hop[ed] that [his] family members or [his] relatives would take [his] girls for [him], and then [he] would just take care of them as . . . needed." Anton suggested that placing the children with these family members could have enabled more opportunities for him to have visited with his children and remain involved in their lives. OCS later asked Anton whether it would be correct to say "that [he] d[id]n't care so much whether [his] parental rights [were] terminated as

-11- **7712**

much as [his] concern that the girls be with members of the family that [he] prefer[red]." Anton responded, "Yes.  That is correct."

On the last day of trial, the court admitted into evidence a letter from representatives of the children's Tribe expressing its support for placing Allie and Melissa with their maternal uncles.

### D.    Termination Order

After trial the superior court terminated Anton's parental rights.  The court concluded that there was clear and convincing evidence that OCS had made active efforts to prevent the breakup of the family.  In support of its conclusion that OCS's efforts had been active, the court found that OCS had developed a case plan for Anton and worked closely with his Tribe "to provide rehabilitative services and efforts" to his family, including researching potential family placements with Anton's relatives and ultimately placing Allie and Melissa with maternal uncles in Canada.

The court acknowledged that OCS had not facilitated visitation between Anton and his children, but it found that Anton's ability to visit with his children "was hampered by [his] imprisonment."  It found that DOC had given OCS "conflicting information about the type of contact [Anton] was permitted to have," including telling OCS that Anton was not allowed to have any in-person visitation with his children, despite testimony indicating that in fact "there were no restrictions on [Anton's] visits." The court found that OCS had "determined it was not in the girls' best interests to have in-person or video visits" with Anton while he was incarcerated, but had recently begun "sending him regular updates and photographs."  It also found that OCS had offered to allow Anton to write letters to his daughters, but that he had chosen not to write these letters.

The court found that while Anton was incarcerated, he had "participated in some programming, including a [six]-week anger management course," but he had "not been able to participate in the . . . domestic violence intervention program required by his case plan" and had not completed a psychological evaluation.  The court

acknowledged that Anton "had a difficult time accessing services through DOC while incarcerated," in part because of the COVID-19 pandemic. However, the court found that "the nature of [Anton's] pending charges and concerns regarding [his] privilege against self-incrimination ma[de] it nearly impossible to conduct meaningful assessments of his rehabilitative needs before his cases resolve." It found that "[t]he significant rehabilitative efforts that are required in this case [could not] effectively begin" until Anton was convicted and sentenced or acquitted and released. It also found that Anton had "refused on at least two occasions to communicate with his caseworker." It concluded that Anton's "inability to conform to [DOC] rules [had] also interfered with his access to rehabilitative opportunities and visitation with his children."

The court also noted that OCS had made various efforts directed to family members other than Anton. It concluded that OCS had made active efforts to reunify the children with their mother. It also found that OCS had investigated the backgrounds of Anton's family members who requested placement of Allie and Melissa. The court found that "[n]one of the family members [Anton] identified are either available for placement or interested in placement," that there were "serious and credible safety concerns" involving many of them, and that those family members who "expressed at least a cursory interest" had not "followed through with the steps necessary to secure placement." The court also found that both Keri and the Tribe supported placing Allie and Melissa with their maternal uncles. The court ultimately concluded that OCS made "active efforts as required by AS 47.10.086 and 25 U.S.C. § 1912(d)."

Anton appeals.

## III.   STANDARD OF REVIEW

Whether OCS made active efforts to prevent the breakup of a family is a mixed question of fact and law.[12] We review the factual findings underlying an active

---

[12]    *Ronan F. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 539 P.3d 507, 514 (Alaska 2023).

efforts determination for clear error,[13] reversing only if a review of the entire record leaves us with "a definite and firm conviction that a mistake has been made."[14] Whether those factual findings satisfy the requirements of ICWA is a question of law to which we apply our independent judgment,[15] "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy."[16]

## IV. DISCUSSION

Anton acknowledges that OCS made active efforts toward reunification prior to his arrest, but he argues that the superior court erred by concluding that OCS made active efforts to prevent the breakup of his family while he was incarcerated.

We observe that OCS's efforts to provide visitation to Anton while he was incarcerated were significantly lacking, and its efforts to provide services to him during his incarceration were passive in some respects.

But OCS made active efforts to reunify the children with both parents prior to Anton's incarceration. It also made active efforts after Anton's incarceration to reunify the children with Keri and later worked with the children's Tribe to place the children with extended family, including those identified by Anton as supporting the goal of reunification. The strength of these efforts supports the court's conclusion that there was clear and convincing evidence that OCS's efforts, considered in their entirety, were active. Accordingly, we affirm the court's order terminating Anton's parental rights.

---

[13] *Id.*

[14] *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021) (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 761 (Alaska 2009)).

[15] *Id.*

[16] *Native Vill. of Kwinhagak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 542 P.3d 1099, 1109 (Alaska 2024).

We begin by explaining the law of active efforts under ICWA as it applies when a parent is incarcerated. We then explain why we agree with the superior court's conclusion that OCS made active efforts to prevent the breakup of Anton's family.

**A.** **ICWA Requires Active Efforts Even When A Parent Is Incarcerated, But The Circumstances Of Incarceration Affect What Efforts Are Possible.**

"ICWA has no exception for incarceration,"[17] and "[n]either incarceration nor doubtful prospects for rehabilitation will relieve [OCS] of its duty under ICWA to make active remedial efforts."[18] Therefore, as in other cases governed by ICWA, OCS's remedial efforts toward incarcerated parents of Indian children "must involve assisting the parent . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan."[19] In other words, OCS must "actually help the parent develop the skills required to keep custody of the children,"[20] and its efforts must be "tailored to the facts and circumstances of the case."[21]

---

[17] *Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1021 (Alaska 2012).

[18] *A.M. v. State* (*A.M. I*), 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235 (Alaska 1996).

[19] 25 C.F.R. § 23.2 (2024); *see also Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 856-57 (Alaska 2013).

[20] *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 849 (Alaska 2009).

[21] 25 C.F.R. § 23.2; *see also Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 561 (Alaska 2022); *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 368 (Alaska 2021); *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 981 (Alaska 2019); *cf. Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1116 (Alaska 2010) (analyzing efforts required to accommodate parent with disability).

ICWA also does not contain any provision allowing a court to approve the discontinuation of active efforts.[22] Even if a case has been pending for an extended period and a child's need for permanency favors terminating parental rights, we will reverse a termination order unless OCS has proven by clear and convincing evidence that it made active efforts to reunite the family.[23]

However, "[t]he circumstances surrounding a parent's incarceration may have a direct bearing on what active remedial efforts are possible."[24] "These circumstances include the duration of the parent's incarceration and the services possible for incarcerated parents."[25] When assessing the efforts made to provide remedial services and rehabilitative programs to an incarcerated parent, we consider not only the efforts made by OCS, but also those made by DOC or another agency.[26] Active efforts may also include "[i]dentifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services" and "facilitating the use of remedial and rehabilitative services provided by the child's Tribe."[27]

When deciding whether OCS's efforts cross the threshold from passive to active, we must evaluate "the State's involvement in its entirety," considering all the

---

[22]     *See* 25 U.S.C. 1912(d); *cf.* AS 47.10.086(b)-(c) (allowing discontinuation of reasonable efforts in non-ICWA cases under certain conditions).

[23]     *See Bill S.*, 436 P.3d at 984 (acknowledging "the importance of achieving permanency for these young children" after several years in OCS custody, but nonetheless reversing termination order).

[24]     *A.M. I*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235 (Alaska 1996); *see also T.F. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 26 P.3d 1089, 1096 (Alaska 2001).

[25]     *Dashiell R.*, 222 P.3d at 849.

[26]     *See T.F.*, 26 P.3d at 1096 (explaining that ICWA does not specify which agency must make active efforts).

[27]     25 C.F.R. § 23.2 (2024); *see also Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 368 (Alaska 2021).

services provided to the family throughout the history of the case.[28]  In doing so, we are mindful not to excuse "extreme" or "egregious" failures.[29]  While "perfection is not the standard,"[30] federal law requires OCS's efforts to be "affirmative, active, thorough, and timely" and "intended primarily to maintain or reunite an Indian child with his or her family."[31]  Those efforts should therefore "increase the likelihood that families will be reunified, or at least reduce the amount of time it takes to determine whether reunification will be possible."[32]

Consistent with ICWA's command that active efforts must be "tailored to the facts and circumstances of the case,"[33] we have credited efforts toward someone other than the parent challenging termination when those efforts were directed at preventing the breakup of the family.  Because reunification with an incarcerated parent may not be possible within a reasonable timeframe, efforts to reunify the children with a nonincarcerated parent are "an important aspect of [OCS's] active efforts to keep the

---

[28]    *Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1021 (Alaska 2012) (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 764 (Alaska 2009)); *Ronald H.*, 490 P.3d at 366.

[29]    *See Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 904 (Alaska 2021).

[30]    *See Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 566 (Alaska 2022).

[31]    25 C.F.R. § 23.2.

[32]    *Jon S.*, 212 P.3d at 769 (Christen, J., dissenting in part).

[33]    *See* 25 C.F.R. § 23.2.

family together."[34]  Efforts to place children with another relative can play a similar role when that placement would further reunification with a parent.[35]

ICWA's implementing regulations support our conclusion that these reunification and placement efforts help satisfy OCS's obligations when a parent is incarcerated for an extended period.[36]  The regulation defining "active efforts" provides a non-exhaustive list of actions that may contribute to OCS's "active efforts,"[37] including various ways of providing a supportive environment for the children and their parents.[38]  We hold that when a parent has been incarcerated for an extended period,

---

[34]    *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 850 (Alaska 2009); *see also, e.g.*, *Clark J.*, 483 P.3d at 902; *Claudio P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 860, 866 (Alaska 2013); *Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1021 (Alaska 2012).

[35]    *See David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 P.3d 767, 779-81 (Alaska 2012) (observing, prior to adoption of 2016 regulations implementing ICWA, that "OCS's early placement decisions may directly impact the ability of parents to fulfill the requirements of their case plans" and therefore be creditable as part of OCS's active efforts); *Jon S.*, 212 P.3d at 766 & n.35 (crediting OCS's attempts to place children with extended family members as part of its active efforts); 25 C.F.R. § 23.2 (providing, in regulation that became effective in 2016, that active efforts may include "contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents").

[36]    *See* 25 C.F.R. § 23.2.

[37]    *See id.* ("Active efforts . . . *may* include, for example . . . ." (emphasis added)); *see also* BUREAU OF INDIAN AFFAIRS, U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT § E.4 (2016) ("The examples of active efforts provided in the ICWA regulations reflect best practices in the field of Indian child welfare, but are not meant to be an exhaustive list.").

[38]    *See* 25 C.F.R. § 23.2 (providing that active efforts may include "contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents," "[t]aking steps to keep siblings together whenever possible," "[i]dentifying community resources . . . and

and particularly when the parent remains incarcerated at the time of the termination trial and may continue to remain so for a substantial period, OCS's work to place the child with an extended family member who supports the goal of reunification may be credited by the court toward active efforts.

**B.** **The Superior Court Did Not Err By Concluding That OCS Made Active Efforts To Prevent The Breakup Of Anton's Family.**

Anton criticizes OCS's efforts to arrange visitation with his children, to connect him with rehabilitative services that were available to him while in DOC custody, and to keep him updated regarding his children and involve him in decisions about their care.

The record reveals weaknesses in OCS's efforts to prevent the breakup of Anton's family, but also some important strengths. There were significant problems with OCS's efforts to facilitate visitation between Anton and his children while he was incarcerated. And although DOC made rehabilitative services available to Anton in jail, OCS's efforts in connection with those services were passive in some instances. However, OCS also made efforts to reunify the children with Keri and later coordinated with the children's Tribe in attempts to place the children with extended family members, including relatives identified by Anton who could have been able to provide more opportunities for visitation with him.

Below we evaluate the efforts OCS made during Anton's incarceration to (1) facilitate visitation, (2) provide rehabilitative services, and (3) reunify the children with Keri and later place them with extended family members. Finally, in subsection (4) we explain our conclusion that, when OCS's efforts are considered in their entirety,

---

actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources," and "[c]onsidering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available").

there is clear and convincing evidence that OCS made active efforts to prevent the breakup of Anton's family.

### 1. OCS's efforts to facilitate visitation while Anton was incarcerated were significantly lacking.

Anton argues that OCS should have done more to provide visitation and other opportunities for contact with his children while he was incarcerated. OCS's efforts to maintain family contact during this period consisted primarily of offering to allow Anton to write letters to his children, passing along cards he sent, and sending him photographs of the children.[39] OCS also developed, but did not implement, a plan that would have allowed Anton to have phone calls with the children. Finally, OCS inquired about the possibility of setting up video visits with the children.

The superior court identified several reasons for OCS's failure to arrange in-person visitation or phone calls with the children. Among these, it noted that there had been a miscommunication between OCS and DOC about whether Anton was allowed to have phone calls or in-person visits with children and that restrictions due to the COVID-19 pandemic had limited Anton's opportunities for in-person visitation. The court also found that OCS eventually "determined it was not in the girls' best interests to have in-person or video visits" with Anton.

Anton argues that "the superior court's finding that OCS denied visitation for acceptable reasons was clearly erroneous." However, the court did not characterize the reasons for the lack of visitation as "acceptable," and the record supports its factual findings regarding the many factors that interfered with visitation. The physical distance between Wildwood and the children's foster home in Anchorage also helps to explain why OCS was unable to arrange in-person visitation. There was also some

---

[39] The superior court found that Anton had declined to write any letters. This finding is supported by the trial testimony of one of the assigned caseworkers, who distinguished between "letters" and "cards" and stated that Anton had not sent letters but had sent cards to his children for Christmas and birthdays.

evidence that it was difficult to schedule phone calls with Anton while he was in DOC custody.

Notwithstanding these challenges, OCS's failure to facilitate any form of visitation between Anton and his children for more than three years without formally notifying him that it had decided to deny visitation is a serious lapse.[40] OCS introduced scant evidence that would excuse or explain its failure to arrange a videoconference visit between Anton and his children after DOC offered to set up such a visit. Although testimony that OCS and the children's guardian ad litem had concerns about in-person visits with Anton supports the superior court's finding that OCS "eventually determined it was not in the girls' best interests" to have in-person visits, the court's finding that OCS had reached the same conclusion regarding virtual visits lacks support. In any event, a determination by OCS that visitation — whether in-person or virtual — is not in a child's best interests does not, on its own, excuse the failure to offer visitation.[41] If OCS decides it is in a child's best interests to deny visitation, it must inform the parent of the denial and the parent's right to request a review hearing.[42] OCS did not do so here.

Anton understandably criticizes the "inconsistency among the reasons" OCS gave for failing to arrange visitation, which he argues shows that "OCS was actively working to prevent a relationship between [him] and his children." There is some evidence to the contrary, including evidence that OCS facilitated visitation and provided Anton with taxi vouchers to help with transportation prior to his incarceration.

---

[40]    *Cf.* AS 47.10.080(p) (stating that OCS generally must provide "reasonable visitation," but may deny visitation "if there is clear and convincing evidence that visits are not in the child's best interests," while providing that if OCS "denies visitation to a parent," it "shall inform the parent . . . of a reason for the denial and of the parent's . . . right to request a review hearing").

[41]    *See id.*

[42]    *Id.*

But considering the record as a whole, OCS's efforts to facilitate visitation in this case fell well short of active efforts.

### 2. OCS and DOC made rehabilitative services available to Anton while he was incarcerated, but its efforts were passive in some respects.

Anton contends that OCS's efforts fell short because it failed to direct him to rehabilitative services that he could access while in DOC custody. Anton acknowledges that DOC made "some relevant programs" available to him and that these services count toward OCS's efforts,[43] but he argues that merely making services available does not satisfy the active efforts standard.[44] He argues that there is no evidence in the record that OCS identified services that he could access while incarcerated or helped take him through the steps of his case plan,[45] despite his demonstrated ability and willingness to seek out services on his own initiative.[46] He also observes that OCS failed to acknowledge any of the services he completed in his case plan evaluations.

---

[43] *See Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 849 (Alaska 2009).

[44] *See A.M. I*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235 (Alaska 1996); *see also Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 903 (Alaska 2021); *cf. Duke S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1127, 1137 (Alaska 2018) (applying "reasonable efforts" standard).

[45] *Cf.* 25 C.F.R. § 23.2 (2024) ("Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan.").

[46] *Cf. Wilson W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 185 P.3d 94, 101 (Alaska 2008) ("If a parent has a long history of refusing treatment and continues to refuse treatment, OCS is not required to keep up its active efforts once it is clear that these efforts would be futile.").

Anton's case plan called for him to complete a domestic violence intervention program, parenting classes, a substance abuse assessment, and a psychological assessment by a specialist with a background in child sexual abuse offenders. It also called for him to participate in a sober support group.

Anton received some of these services while incarcerated, including a substance abuse assessment that either DOC or OCS encouraged him to complete.[47] He also participated in a six-week anger management course. Anton's participation in these DOC programs is relevant to our analysis of OCS's efforts, regardless of whether OCS actively identified these services as relevant or referred Anton to them. While Anton correctly suggests that it would have been helpful for OCS to inquire with DOC to determine what services could be made available to him while he was incarcerated, we do not require OCS to refer an incarcerated parent to programs in which the parent has already voluntarily enrolled.[48]

However, Wildwood did offer sober support groups, and OCS did not show that Anton had been referred to such a group or that he had participated in one. OCS also did not update Anton's case plan to acknowledge the limited services available to him while he was in custody. Finally, apart from some evidence that either DOC or OCS encouraged Anton to pursue the behavioral health assessment he completed, there is little indication in the record that OCS was actively taking Anton through the steps of his case plan while he was incarcerated.

The circumstances of Anton's incarceration made it impossible or impractical for OCS to provide some of the services listed in his case plan, which affects

---

[47]    The superior court found that Anton had not participated in a substance abuse assessment. However, that finding is clearly erroneous. The record shows that Anton completed a behavioral health assessment, including a substance abuse assessment, while he was at Goose Creek.

[48]    *See A.M. v. State (A.M. II)*, 945 P.2d 296, 305-06 (Alaska 1997).

our assessment of OCS's efforts.[49] For example, because Wildwood did not offer a domestic violence intervention program, it was not possible for OCS to provide that service to Anton.[50] The circumstances of Anton's then-pending criminal charges for sexual assault and uncharged allegations that he had sexually abused Iris, considered alongside his assertion of the privilege against self-incrimination at trial, support the superior court's finding that it would be "nearly impossible to conduct meaningful assessments of his rehabilitative needs before his cases resolve."

As the superior court observed, the practical difficulties presented by Anton's incarceration during the COVID-19 pandemic are also relevant to the assessment of OCS's efforts to provide services in this case.[51] Anton challenges the court's finding that these circumstances "made it difficult" for OCS to engage with him, but because this finding is supported by trial testimony and not clearly erroneous, we will not second-guess it.[52] The record also shows that Anton declined multiple calls from OCS caseworkers, hindering their efforts on his behalf. Finally, the record supports the superior court's finding that Anton's misconduct "interfered with his access to rehabilitative opportunities and visitation with his children." This misconduct led Anton to be reclassified to a more restrictive status, affecting his access to visitation.

---

[49] *See A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (noting that "practical circumstances surrounding a parent's incarceration" are "a significant factor in our evaluation of the adequacy of the State's efforts").

[50] The record does not indicate whether a psychological evaluation was available while Anton was incarcerated.

[51] *See id.*; *see also A.M. I*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235 (Alaska 1996); *T.F. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 26 P.3d 1089, 1096 (Alaska 2001).

[52] *See Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) ("[W]e will not reweigh evidence when the record provides clear support for the superior court's ruling.").

Like other circumstances of Anton's incarceration, it is relevant to the active efforts inquiry because it affected his access to services,[53] limiting "what active remedial efforts [were] possible."[54]

### 3. OCS made active efforts to reunify the children with Keri and later to place them with either Anton's or Keri's relatives.

OCS made efforts to reunify the children with Keri for at least the first 18 months after it took custody, including connecting Keri with services, arranging a trial home visit, and helping Keri arrange childcare so she could participate in parenting classes. We agree with the superior court that these efforts were active. While the record does not indicate what efforts OCS may have made toward Keri after it filed a petition to terminate her parental rights in May 2021, the efforts it made before then are "an important aspect of [OCS's] active efforts to keep the family together."[55]

Working alongside the children's Tribe, OCS also made efforts to investigate the possibility of placing the children with several members of Anton's family that Anton identified as potential placements. Anton suggested that placing the children with these family members could have enabled more opportunities for him to visit with his children and remain involved in their lives. OCS's efforts to place the children with these relatives were consistent with Anton's statement at the termination trial that he cared more that his children be placed with his preferred family members than that he retain his parental rights.

OCS eventually placed the children with members of Keri's family — the children's maternal uncles — who took steps to keep Keri involved in the children's

---

[53] *See Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1022 (Alaska 2012); *T.F.*, 26 P.3d at 1096; *A.A.*, 982 P.2d at 262-63.

[54] *See A.A.*, 982 P.2d at 261.

[55] *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 850 (Alaska 2009).

lives and expressed a commitment to maintaining the children's connection with their Tribe.

OCS's efforts to place the children with family members were not perfect: Most notably, it initially excluded Anton's brother, Jeremy, from consideration because it confused him with a sex offender with a similar name and birthdate. However, even considering this mistake, OCS's efforts to place Allie and Melissa with family members were "affirmative, active, thorough, and timely," and the record supports the conclusion that these efforts were "intended primarily to maintain or reunite" the children "with [their] family" by supporting the goal of reunification with either Anton or Keri.[56] In particular, OCS's significant efforts, in coordination with the children's Tribe, to place the children with members of Anton's family who could have enabled more opportunities for him to visit with his children support the superior court's active efforts determination.

Anton argues that OCS's efforts were insufficient because it did not "include [him] in decision-making and important updates regarding his children," including decisions about foster placements. We reject this argument. OCS did include Anton in its decision-making: It took seriously his preference that his children be placed with members of his family, and it made active efforts to honor that preference. And although OCS's efforts to keep in contact with Anton and provide updates about his children's wellbeing were lacking in many respects, as we have explained, the context of Anton's incarceration affects the scope of the efforts that ICWA requires.[57] To the extent that Anton is asserting additional rights to participate in decision-making and receive updates beyond what ICWA requires, he has not articulated a basis for those

---

[56]    *See* 25 C.F.R. § 23.2 (2024) (providing that active efforts may include "contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents").

[57]    *See A.A.*, 982 P.2d at 261.

rights, which are not among the enumerated residual rights retained by parents of children in OCS custody.[58]  Therefore, while the gaps in OCS's communication with Anton are relevant to whether OCS made active efforts to prevent the breakup of his family, Anton has not shown that OCS violated a duty to involve him in decision-making or to keep him informed.

### 4.  Considered in their entirety, OCS's efforts were active.

We conclude that OCS proved by clear and convincing evidence that its efforts in this case, considered in their entirety, were active.  This conclusion depends in part on the strength of OCS's efforts to reunify the children with both parents prior to Anton's incarceration.  It also depends on the strength of the efforts OCS made after Anton's incarceration to reunify the children with Keri and later to work with the children's Tribe to place the children with extended family members, including relatives Anton identified who could have supported the goal of reunification.

As Anton concedes, OCS made active efforts toward both him and Keri during the brief period when he was not incarcerated, including arranging visitation, including him in team decision meetings, and providing him with taxi vouchers to help him travel to and from visits and other appointments.

The circumstances and duration of Anton's incarceration necessarily delayed the possibility of reunification with him:  Between removal and the termination trial, Anton was incarcerated for more than three years — the majority of his children's lives, up to that point.  He faced a presumptive sentence of multiple decades in prison if he were to be convicted — as he later was — on the most serious charges against him.[59]  Restrictions due to COVID-19, Anton's reclassification to "close custody"

---

[58]      *See* AS 47.10.084(c); *see also Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 551 (Alaska 2017) (noting that residual rights of parents of children in OCS custody are limited).

[59]      *See* AS 12.55.125(i)(1)(D), (i)(3)(C).

status, and his decision to decline some calls from OCS caseworkers also interfered with OCS's ability to provide Anton with both rehabilitative services and visitation.

Given these circumstances, we give substantial weight to OCS's efforts after Anton's incarceration to reunite the children with Keri.[60] We agree with the superior court that these efforts were active.

We also credit OCS's efforts to place the children with Anton's and Keri's family members because those efforts advanced the goal of reunifying the children with their parents. In particular, OCS's efforts in partnership with the children's Tribe to place the children with paternal relatives are relevant because placement with those family members could have helped Anton make progress on his case plan goals by providing "family structure and support"[61] and enabling more opportunities for visitation than were available while the children were placed with a non-relative foster parent.[62]

OCS's rehabilitative efforts toward Anton were certainly flawed. Its efforts to facilitate contact with Anton's children while he was incarcerated were sorely lacking. Although services were available to Anton during his incarceration, OCS's efforts in connection with those services were passive in some respects. However, OCS's efforts in this case extended well beyond the services it provided directly to Anton, and we conclude that its efforts "crossed the threshold between passive and active efforts."[63]

---

[60] *See Dashiell R.*, 222 P.3d at 850.

[61] *See* 25 C.F.R. § 23.2 (providing that active efforts may include "contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents").

[62] *See David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 P.3d 767, 779 (Alaska 2012).

[63] *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011).

## V.   CONCLUSION

We AFFIRM the superior court's order terminating Anton's parental rights.